**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**DWAYNE FITZPATRICK STEPHENS,**

     **Plaintiff,**

**v.**                                  **Case No.: 3:14-cv-25232**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

     **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 10, 11).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for

judgment on the pleadings be **DENIED**, that the Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On April 23, 2012 and August 16, 2012, respectively, Plaintiff Dwayne Fitzpatrick Stephens ("Claimant"), filed applications for DIB and SSI, alleging a disability onset date of June 19, 2010, (Tr. at 191, 200), due to post-traumatic stress disorder ("PTSD"), sleep apnea, and anxiety. (Tr. at 224). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 122, 125, 132-145). Claimant filed a request for an administrative hearing, (Tr. at 159, 161), which was held on January 10, 2013, before the Honorable Robert Bowling, Administrative Law Judge ("ALJ"). (Tr. at 39-66). By written decision dated February 26, 2013, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 19-32). The ALJ's decision became the final decision of the Commissioner on June 27, 2014, when the Appeals Council denied Claimant's request for review. (Tr. 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer opposing Claimant's complaint, and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 10), and the Commissioner subsequently filed a Brief in Support of Defendant's Decision, (ECF No. 11). Consequently, the matter is fully briefed and ready for resolution.

## II.   Claimant's Background

Claimant was 45 years old at the time he filed the instant applications for benefits, and 46 years old on the date of the ALJ's decision. (Tr. at 19, 191,200). He completed the

twelfth grade in school and communicates in English. (Tr. at 44, 223, 224). Claimant has past relevant work as a tractor-trailer driver. *(*Tr. at 30*).

### III.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this

determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes

of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2015. (Tr. at 21, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since June 18, 2010, the alleged disability onset date. (Tr. at 21, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "minor motor seizures, sleep-related breathing disorders, obesity, affective disorders, and anxiety-related disorders." (Tr. at 21-22, Finding No. 3). The ALJ considered Claimant's additional alleged impairments of

hypertension, mild hand tremors, diverticulosis, internal hemorrhoids, and degenerative joint and disc disease. (Tr. at 22). However, the ALJ found these alleged impairments to be non-severe. (*Id.*).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 22-25, Finding No. 4). Accordingly, he determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant is limited to frequently climbing ramps and stairs, occasionally crawling, but never climbing ladders, ropes, or scaffolds. Additionally, the claimant is able to stand for approximately six out of eight hours per day and sit for approximately six out of eight hours a day. However, the claimant must avoid all use of moving machinery, and all exposure to unprotected heights. Furthermore, the claimant is limited to simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work-related decisions, and with few, if any, workplace changes. Finally, the claimant is limited to occasional supervision and interaction with the public and co-workers.

(Tr. at 25-30, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform past relevant work. (Tr. at 30, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 31-32, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1967, and was defined as a younger individual age 18-49; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding of non-disability regardless of Claimant's transferable job skills. (Tr. at 31, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ

determined that Claimant could perform jobs that exist in significant numbers in the national economy, (Tr. at 31-32, Finding No. 10); including work in medium, unskilled occupations, such as in the cleaner or janitor; light unskilled occupations, such as laundry worker; and sedentary unskilled positions, such as machine monitor. (Tr. at 32). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and thus was not entitled to benefits. (Tr. at 32, Finding No. 11).

IV.   <u>**Claimant's Challenge to the Commissioner's Decision**</u>

Claimant raises one challenge to the Commissioner's decision. (ECF No. 10 at 7). He alleges that the ALJ's RFC finding is not supported by substantial evidence, because the ALJ failed to completely consider the non-examining state agency experts' opinions. (*Id.* at 9-10). According to the Claimant, even though the ALJ gave "great weight" to the opinions of agency psychologists, Dr. David Deitz and Dr. Karla Voyten, he failed to incorporate all of their opinions in the RFC finding. Consequently, when he presented hypothetical questions to the vocational expert, he received answers based upon a faulty premise. (*Id.* at 9-10). Claimant contends that when all of the agency experts' opinions were included in the hypothetical questions posed by his attorney, the vocational expert confirmed that Claimant was incapable of working. Thus, the ALJ's exclusion of certain expert opinions in his RFC finding was prejudicial to Claimant. Finally, Claimant argues that the ALJ failed to present a clear rationale for his decision not to incorporate all of the experts' opinions in his RFC finding.

In response, the Commissioner argues that the ALJ complied with Social Security rules and regulations in his treatment of Dr. Deitz's and Dr. Voyten's opinions. (ECF No. 11 at 7-10). The Commissioner points out that the ALJ gave "great" weight, but not controlling weight, to these experts' opinions; therefore, Claimant should not have

expected all of the minutia of their opinions to appear in the RFC finding. (*Id.* at 7). The Commissioner further maintains that the ALJ's hypothetical questions were entirely consistent with the RFC finding, which in turn, was consistent with the consultants' opinions and the record as a whole.

## V.   **Relevant Medical Evidence**

The undersigned has reviewed all of the evidence before the court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows:

### A. Treatment Records

On June 25, 2010, Claimant presented to Gerald Price, M.D., with complaints of flashbacks and nightmares related to a recent motor vehicle accident. (Tr. at 267). Claimant told Dr. Price that two weeks earlier, he had been involved in a serious accident while driving a truck for R&L Trucking. He indicated that his truck went off the road, crashed, and caught on fire, forcing him to break out of the truck to escape the flames. Claimant was subsequently terminated by the trucking company, because the damage to the tractor-trailer exceeded $50,000. (*Id.*) Claimant described having nightmares and flashbacks of the accident and stated that he was afraid to get into cars. Claimant also reported that he was a veteran with some combat experience, and his military service had caused him similar "trouble;" however, those issues resolved spontaneously.

Upon examination, Claimant was alert and cooperative and seemed to be "in his right mind," in no immediate distress, although he appeared slightly anxious. (*Id*). Dr. Price prescribed Citalopram, Trazodone, and Hydroxyzine and provided Claimant with an excuse from work on the basis of a medical disability. He recommended that Claimant seek counseling with Linda Snellman, a licensed independent social worker. (*Id.*).

### Linda Snellman, Licensed Independent Social Worker

On June 29, 2010, Claimant met with Linda Snellman for an initial evaluation. (Tr. at 311-13). Claimant reported that he had been involved in an accident in which the truck he was driving burst into flames. Now, he was afraid to drive, and was afraid of fires and guardrails. (Tr. at 311). Claimant also stated that he had lost his son and fiancé in a motor vehicle accident twenty-one years earlier when their car was struck by a drunk driver. In addition, Claimant had seen an army friend commit suicide by shooting himself. These traumatic experiences had left Claimant with nightmares, flashbacks, trouble sleeping, and anxiety when riding in vehicles. (*Id.*). Ms. Snellman performed a mental status examination, beginning with her observations of Claimant. (Tr. at 313). She found that Claimant was neatly dressed with fair eye contact and flat facial expressions. His speech was fluent although motor activity was slightly lethargic. Claimant demonstrated fair insight and judgment; however, his mood was anxious and his affect depressed. Claimant admitted to a prior suicide attempt, which occurred shortly after his son and fiancé died. Ms. Snellman diagnosed Claimant with anxiety and depression, scoring him at 50 on the Global Assessment of Functioning Scale.[1] (Tr. at 313). She listed treatment barriers as including poor coping skills; increased anxiety, depression, and fear; limited social supports; recent job loss; and problematic finances. (*Id.*).

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders ("DSM")*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score indicates a less severe impairment. In the past, this tool was regularly used by mental health professionals; however, in the DSM-5, the GAF scale was abandoned, in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16. Americ. Psych. Assoc, 32 (5th Ed. 2013). A GAF score of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).

Claimant returned to Ms. Snellman's office on July 6, 2010. (Tr. at 309-10).  He reported having some difficulties with driving, and also when he watched a movie that included a fire scene. (Tr. at 309). He advised that he had not started taking any of the drugs prescribed for him, because he could not afford them. Claimant's mental status examination was essentially unchanged, and his GAF score remained at 50. (Tr. at 310).

On July 13, 2010, Claimant reported to Ms. Snellman that he was having a "good day." (Tr. at 307). His mental status examination had not changed significantly, although his mood/affect were documented as "friendly." Claimant talked some about the truck accident, and Ms. Snellman noted that he appeared calmer, with less anxiety and fear. (Tr. at 308). His diagnoses remained the same, but his GAF score had increased to 53.[2] Claimant was given a follow-up appointment on July 27, 2010; however, he canceled the appointment, because he had no transportation. (Tr. at 314). Claimant also mentioned that he had gotten into a fight with his nephew, had been arrested, and was bailed out by a friend. Ms. Snellman provided Claimant with the telephone number for a transportation company. (*Id.*).

When Claimant appeared on August 9, 2010, he continued to have significant issues with his nephew. (Tr. at 305). He indicated that his nephew was pressing charges against him over the fight, and Claimant felt he needed to distance himself from his nephew. On mental status examination, Claimant was described as a bit anxious and preoccupied by guilt feelings. (Tr. at 306). Claimant stated that he still felt considerable anxiety when driving and became especially anxious when passing guardrails. Claimant's

---

[2] GAF scores between 51 and 60 indicate "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

diagnoses remained the same, and his GAF was stable at 53. At his follow-up visit on August 19, 201o, Claimant continued to complain about his nephew and his fear of driving. (Tr. at 303). Claimant's mental status examination was unchanged, and his GAF score was 54. (Tr. at 304). These findings remained the same at Claimant's last visit in August. (Tr. at 301-02).

At a September 10, 2010 appointment, Ms. Snellman noted that Claimant appeared alert and displayed a friendly affect/mood. (Tr. at 299). Claimant discussed the situation with his nephew, advising that they both had sworn out charges against each other over the fist fight, but ultimately agreed to dismiss them. However, Claimant was required to do community service, which he found embarrassing. Claimant stated that he wanted to get his life "straightened out." His diagnoses remained the same, but his GAF scored increased to 58. (Tr. at 300). Claimant did not return again until September 30, 2010. (Tr. at 297-98). On this visit, Claimant was noted to be anxious and "on edge." He stated that this time of year triggered nightmares about the death of his fiancé and son. Driving was becoming harder for him. Claimant had also learned that his nephew was sick. Ms. Snellman discussed coping skills with Claimant. His diagnoses and GAF score were unchanged. (Tr. at 298).

Two weeks later, on October 14, 2010, Claimant reported he was not able to sleep due to nightmares. (Tr. at 295). Ms. Snellman described Claimant as anxious and on edge. Claimant had been completing a PTSD workbook, and discovered that he did not really like other people and was not sure he could get along with them. (Tr. at 295-96). Claimant stated that he continued to have nightmares about the deaths of his fiancé and son, and recently realized that he still had a great deal of anger over the situation. His diagnoses stayed the same, but his GAF score increased to 59. (Tr. at 296).

Claimant cancelled his counseling sessions in November 2010, because he had to finish his community service obligation. (Tr. at 293). On December 2, 2010, Claimant returned to Ms. Snellman, complaining that his nephew had taken out a loan in Claimant's name without his knowledge or permisssion. He also reported having flashbacks and was terrified of bridges. (*Id.*). Ms. Snellman documented that Claimant appeared lethargic and anxious. The remainder of his mental status examination was stable. (Tr. at 293-94). Claimant's diagnoses and GAF score remained unchanged. (Tr. at 294).

On January 6, 2011, Ms. Snellman completed a Daily Activities Questionnaire about Claimant at the request of the Bureau of Disability Determination. (Tr. at 289-90). Ms. Snellman stated that Claimant lived alone most of the time and saw friends or family on a weekly basis. In past working situations, Claimant felt that his co-workers dumped their problems on him, although he was "okay" with bosses. Ms. Snellman reported that Claimant had trouble cooking due to the heat and flames; could not always complete household chores; had no problem with personal hygiene; had great difficulty driving; and did not partake in many hobbies. He watched television most of the time. Ms. Snellman opined that Claimant had a severe level of PTSD, which kept him from driving much and from doing simple tasks at times. (*Id.*). Ms. Snellman added that Claimant needed to be on prescription medications for his psychological diagnoses, but was unable to afford them. (Tr. at 290).

Claimant continued treatment with Ms. Snellman throughout the winter and early spring of 2011. (Tr. at 318-329). His diagnoses and complaints remained the same; however, he began to demonstrate a sustained improvement in his functioning, with his GAF scores steadily increasing. (Tr. at 319, 322, 325, 328 329). On April 28, 2011,

12

Claimant appeared anxious and depressed, but his behavior was described as unremarkable and his score was 66.[3] Ms. Snellman and Claimant discussed treatment options that might be available to him through the Veterans Affairs medical Center ("VAMC"). (Tr. at 641-43).

On May 26, 2011, Claimant presented to Ms. Snelling for follow-up care. (Tr. at 644-46). Claimant reported that he had visited with his parents in West Virginia and had gone to the VAMC in Huntington to get reestablished as a patient. Ms. Snellman diagnosed Claimant with PTSD and Major Depression, Recurrent. (Tr. at 645). However, her notes indicated that counseling appeared to be helping Claimant, and his GAF score was recorded as 68. (*Id.*).

Claimant returned to Ms. Snellman on June 16, 2011, after his initial visit at the Huntington VAMC. (Tr. at 647-49). He reported receiving medication to treat his symptoms, but complained that it gave him nightmares. (Tr. at 647). Claimant also stated that he continued to have problems sleeping. On mental status examination, Claimant's behavior and psychomotor status were documented as unremarkable, although his mood was anxious and depressed. Claimant demonstrated erratic and inconsistent memory; however, his reasoning, impulse control, judgment, and insight were assessed as fair. He communicated a hopeful attitude. Claimant was assessed with PTSD and Major Depression, recurrent. His GAF score remained 68. (Tr. at 648).

On July 11, 2011, Claimant was seen again by Ms. Snellman. (Tr. at 650-52). He reported that his VAMC therapist agreed to stop his psychiatric medication. Claimant also

---

[3] A GAF score between 61-70 indicates some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

told Ms. Snellman that he had joined the American Legion, hired an attorney, and had completed disability paperwork. Claimant presented with unremarkable behavior and psychomotor behavior. (Tr. at 650). His mood was anxious and depressed, and he displayed an erratic and inconsistent memory. Ms. Snellman assessed Claimant with PTSD and Major Depression, not otherwise specified ("NOS"). However, his GAF score increased to 70. (Tr. at 651). Claimant was advised to continue his current treatment plan and talk to his therapist at the VAMC about PTSD options.

### *Huntington VAMC*

On June 2, 2011, Claimant had an initial visit with the VAMC's mental health department. (Tr. at 374-77). Claimant was interviewed by Julie M. Branhan, LICSW, to follow-up on a positive PTSD screen taken earlier in the day. Claimant denied having any current thoughts of suicide, indicating that his last attempt had been in 1989 after his fiancé and son were killed in a motor vehicle accident. (Tr. at 375). Claimant related a series of other traumatic events in his life, including his own truck accident, the suicide of an army friend, and another serious motor vehicle accident that occurred while he was in the army. (Tr. at 376). Claimant indicated that he was extremely anxious and had applied for Social Security disability, but was denied. Accordingly, he intended to apply for benefits through the VA. Ms. Branhan assessed Claimant with Anxiety Disorder, rule out PTSD, and Depressive Disorder, NOS. She assigned a GAF score of 55. Noting that Claimant was open to medication, Ms. Branhan recommended that Claimant be prescribed Celexa, and the prescription was written by Patricia C. Wright, a nurse practitioner. (Tr. at 377).

Claimant returned to the VAMC for counseling with Ms. Branhan on June 30, 2011. (Tr. at 373-74). Claimant advised that after taking Celexa for three days, he began to

experience vivid, realistic nightmares, which increased his anxiety. (Tr. at 373). He reported that Ms. Snellman was encouraging him to do exposure therapy, but he felt too incapacitated by his symptoms to venture into crowds. (*Id.*). Claimant was assessed with Anxiety Disorder, NOS, rule out PTSD; and Depressive Disorder, NOS. His GAF score was 55. Ms. Branhan discussed medication treatment options, but Claimant declined further medication, instead choosing to simply continue counseling. (Tr. at 373-74).

On August 4, 2011, Claimant presented to Clifton R. Hudson, Ph.D., at the VAMC for a Compensation and Pension examination ("C & P"), in connection with his diagnosis of rule out PTSD. (Tr. at 348-62). For his diagnostic summary, Dr. Hudson opined that Claimant's symptoms did not meet the DSM-IV's diagnostic criteria for PTSD. (Tr. at 350). He noted that Claimant was "volunteering PTSD-like symptoms without prompting." (Tr. at 354). Dr. Hudson pointed out that Claimant did not receive any mental health treatment post-military until his truck accident in 2010. (Tr. at 356). As far as complaints, Claimant reported that he stayed to himself and did not have any friends. He also complained of depression, poor energy, sleep issues, and no motivation for activity. (Tr. at 361). Dr. Hudson recorded MMPI-2 scores which revealed "clear psychomotor evidence of malingering which is consistent with an extreme and internally inconsistent clinical presentation." (*Id.*). Dr. Hudson opined that Claimant probably was not as anxious or depressed as he claimed, but it was not possible to make a definitive determination in light of Claimant's current "over-reporting" of symptoms and functional impairment. (Tr. at 362). In the end, Dr. Hudson concluded that any real anxiety and depression suffered by Claimant was attributable to his civilian motor vehicle accident, and not from any experiences he had while in the military. (*Id.*).

On October 6, 2011, Claimant presented to Julie Marie Brawn, LICSW, expressing

anger over Dr. Hudson's C & P report. (Tr. at 547-48). He indicated that the report was a recent example of "him being wronged by another." (Tr. at 547). Ms. Brawn discussed with Claimant the meaning of the term "malingering," his childhood teachings, and his current views. She described Claimant as being very "rigid" in his thinking. (*Id.*). Claimant stated that he did not know how to get better, and indicated that he would never be able to drive again due to anxiety.  On mental status examination, Claimant was oriented with intact insight and judgment. His mood was anxious and angry. (Tr. at 547). Ms. Brawn assessed Claimant with Anxiety Disorder, NOS, and Depressive Disorder, NOS. His GAF score was 57. (Tr. at 548).

Claimant returned for therapy with Ms. Brawn on November 10, 2011 and December 8, 2011. (Tr. at 535-537). At the November visit, Claimant reported a continued fear of driving, problems falling asleep, and nightmares. (Tr. at 539). At the December visit, Claimant expressed paranoid thoughts regarding Dr. Hudson and the basis of his C & P examination results. (Tr. at 536). Claimant remained anxious, avoidant, and isolated. Ms. Brawn observed that Claimant was resistant to systematic desensitization or other interventions intended to decrease his avoidant behavior. (Tr. at 536).

Claimant presented to Ms. Brawn on January 9, 2012 with ongoing complaints of anger and sleep issues, describing himself as "cursed." (Tr. at 533-34). Ms. Brawn documented that Claimant had an anxious mood and broad affect, with intact insight and judgment. She opined that Claimant would benefit from therapies designed to reframe his "distorted thinking." Claimant's assessment remained the same, as did his GAF score. (Tr. at 534). The following month, on February 6, Claimant expressed his anger at and distrust of others. (Tr. at 516). Claimant re-asserted his belief that in view of the many bad things that had happened to him, he would never be able to feel happy again. Ms. Brawn

asked him why he continued to come to therapy, and Claimant acknowledged that he did not know. (*Id.*). Claimant was resistant to any kind of therapeutic intervention, admitting that he did not want to change. At his request, Claimant's case was closed. (Tr. at 515-16).

However, on March 19, 2012, Claimant called the VAMC, requesting mental health therapy for treatment of his ongoing anxiety, nightmares, and irritability. (Tr. at 508). Claimant presented to Ms. Brawn with broad affect and anxious mood, although his thoughts were relevant and his insight and judgment were intact. (*Id.*). Claimant retained an assessment of Anxiety, NOS, and Depressive Disorder, NOS, and was given a GAF score of 57. (Tr. at 509). Ms. Brawn suggested a referral to a specialty unit because she did not feel that Claimant was making sufficient progress with her. Ms. Brawn arranged for Claimant to have an intake assessment on March 29, 2012. (*Id.*).

Claimant presented to the VAMC on March 29, 2012 for his scheduled mental health evaluation. (Tr. at 495-506). Claimant complained of anxiety, depression, irritability, panic attacks, excessive worrying, trouble falling asleep and staying asleep, decreased energy and concentration, hopelessness, helplessness, and worthlessness. (Tr. at 497). He reported isolating himself from others and having decreased interest in activities. Claimant suspected that he might have Bipolar Disorder. C. David Bishop, LICSW, performed a mental status examination, documenting Claimant's appearance and behavior as within normal limits. (Tr. at 503). His attitude was cooperative; his behavior and speech were normal; and his affect was congruent with his mood, which Claimant described as angry. (Tr. at 503-04). Claimant presented intact judgment and insight, with a low suicide risk. Mr. Bishop assessed Claimant with Depressive Disorder, NOS, and Anxiety Disorder, NOS. His current GAF score was 60. (Tr. at 506). Mr. Bishop noted Claimant's request for therapy to help him become more sociable and arranged for

him to be seen by Melanie Ellerbrock on April 4, 2012. (*Id.*). In the meantime, Claimant met with Mary Wise, a nurse practitioner, to discuss his treatment needs. (Tr. at 493-94). After some discussion, Claimant indicated his willingness to try a low dose of Paxil. Claimant was scheduled for therapy at that time and prescribed a 10 mg. dose of Paxil. (Tr. at 494).

On April 5, 2012, Claimant was interviewed by Melanie Ellerbrock, LICSW. (Tr. at 492). He told Ms. Ellerbrock, "I just don't think I can work." (*Id.*).  Claimant reported having panic attacks and anxiety when in crowds, and he no longer drove due to anxiety. Claimant indicated that he did not like other people and he felt that God was out to get him. Ms. Ellerbrock assessed Claimant with Anxiety Disorder, NOS. Claimant returned to Ms. Ellerbrock's office on April 19, 2012 for follow-up. (Tr. at 486-88). After conducting an interview and mental status examination, Ms. Ellerbrock again assessed Claimant with Anxiety Disorder, NOS, rule out PTSD, and he was given a GAF score of 45. (Tr. at 486-89). Ms. Ellerbrock provided sixty minutes of supportive psychotherapy. (Tr. at 489). Claimant expressed his distaste for psychotropic medications, but agreed to walk half an hour per day for mood improvement and weight loss. (*Id.*).

Claimant met with Mary Ann Callen, Psy.D., on June 6, 2012 for an assessment of his PTSD. (Tr. at 468-70). Claimant complained of sleep issues, intrusive thoughts, isolation, nightmares, and sense of foreboding that his quality of life was deteriorating due to past events. (Tr. at 469). Claimant completed the Beck Hopelessness Scale, Beck Depression Inventory-IOI, a PTSD checklist (PCL), and a life events checklist. (Tr. at 470). Claimant was also administered the Clinician Administered PTSD scale for DSM-IV, but could not complete it as the questions were too upsetting. Claimant was diagnosed with Adjustment Disorder, Chronic, Provisional (trauma-related). He received a GAF score of

18

58. Dr. Callen observed that although the majority of Claimant's self-reports were notable for extreme symptom endorsement, she believed the tests seemed to accurately reflect subjective distress, both current and cumulative, experienced by Claimant. (*Id.*). Claimant was provided information on exposure therapy and was asked to consider participating, but subsequently declined. (Tr. at 468). He did communicate interest in one-on-one therapy.

Claimant met with Dr. Callen on June 25, 2012. (Tr. at 467). Claimant appeared alert and oriented with clear speech and fair insight and judgment. His mood was euthymic and affect was mood-congruent. Claimant expressed having trust issues and communicated a negative schema about life. He was offered psychotherapy, but was hesitant to commit to weekly sessions. He agreed to consider the matter and call with his decision. (*Id.*).

On September 13, 2012, Claimant presented to Dr. Callen for therapy. (Tr. at 621-22. He appeared alert and oriented, demonstrating normal speech and good eye contact. (*Id.*). ). Claimant was diagnosed with Adjustment Disorder, Chronic, related to military trauma. After this session, Claimant returned to Dr. Callen for five additional therapy sessions from September 20, 2012 through October 25 2012. (Tr. at 623, 625-29, 631). On November 7, 2012, Claimant called Dr. Callen to cancel their appointment. He was audibly upset and reported that his mother had died unexpectedly. (Tr. at 635). On November 26, 2012, Claimant spoke again with Dr. Callen and told her he was not ready to resume therapy. (Tr. at 636). He eventually returned for a therapy session on January 2, 2013. (Tr. at 688). On that visit, Claimant appeared alert and oriented, maintaining good eye contact. His mood was sad. His affect was tearful. Claimant spoke about the loss of his mother, the impact of her death on his father, and his difficulty accepting that so

19

many personal losses could happen to one individual. (*Id.*).

Claimant returned to Dr. Callen's office on February 28, 2013. (Tr. at 686-87). He reported ongoing difficulty dealing with his mother's unexpected death. He complained of difficulty sleeping, as well as panic attacks, racing thoughts and auditory hallucinations. (Tr. at 687). Dr. Callen felt Claimant should consult with another therapist regarding the grieving process, and made arrangements for that consultation.

On March 4, 2013, Claimant presented to James Overfelt, a nurse practitioner at the VAMC, for bereavement therapy. (Tr. at 677-82). Claimant expressed a desire to improve the quality of his life. He reported experiencing sleep disruption, intrusive thoughts, and isolation. On mental status examination, Claimant was observed to be neatly groomed with casual attire. (Tr. at 679). His mood was euthymic; his affect was congruent; and his judgment and insight were fair. Mr. Overfelt suggested some coping skills; however, Claimant stated that he "did not believe [he] can get better." (*Id.*). Claimant was assessed with Adjustment Disorder, mixed with Anxiety and Depressed Mood; and Personality Disorder, NOS. He was given a GAF score of 55. Claimant was told to exercise daily, continue with therapy, and take medications as prescribed.

On March 7, 2013, Claimant presented to Dr. Callen for an assessment of his progress. (Tr. at 671). Dr. Callen noted that Claimant was on time for the appointment, and was neatly dressed and groomed. He had good eye contact and normal speech patterns; however, his mood and affect were anxious. Claimant reported having some auditory hallucinations. In addition, Dr. Callen felt that Claimant continued to demonstrate paranoid delusions. She noted that Claimant was scheduled for testing and supportive therapy later in the month. His GAF score was 48, indicating the presence of serious symptoms. However, when Claimant returned to Dr. Callen on March 21, 2013,

he appeared alert and oriented with good eye contact, fair judgment and insight, with euthymic mood. (Tr. at 669-70).

On March 25, 2013, Claimant presented to the VAMC and saw Lauren L. Davidson, Psy.D., for completion of the Rorschach Inkblot test. (Tr. at 668-69). Objectively, Claimant appeared alert and oriented, with appropriate mood and affect. He was cooperative, although his thought process was somewhat circumstantial. (Tr. at 669). Claimant's insight and judgment were noted to be within normal limits. There was no evidence of response to internal stimuli or overt delusions in his expressed thoughts. His response to the test was receptive and engaged. Dr. Davidson reported the results of the Rorschach Inkblot test on March 27, 2013. (Tr. at 666-68). Claimant's scores showed several characteristics commonly seen in those with suicidal thoughts and tendencies. His answers also suggested serious impaired capacity to think logically and coherently. Dr. Davidson advised that Claimant's responses suggested the distinct possibility he suffered from a schizophrenia-spectrum disorder, and his functioning limitations would be consistent with that disorder. (Tr. at 666). He also appeared susceptible to episodes of affective disturbance that were likely to involve features of depression. (Tr. at 667). Claimant lacked a well-defined coping mechanism and was emotionally reserved.

Claimant participated in therapy with Dr. Callen on March 28, 2013. (Tr. at 665-66). Claimant was assessed with Depressive Disorder, NOS, and Delusional Disorder. (Tr. at 665). Dr. Callen went over the results of the testing with Claimant, and he was appreciative of and in agreement with the findings. Claimant returned to Dr. Callen's office on April 1, 2013. (Tr. at 664-65). Claimant was alert and oriented with good eye contact and euthymic mood. His diagnoses remained the same, and he was instructed to continue with therapy. (Tr. at 664).

Claimant saw Mohammad Javed, M.D., a staff psychiatrist at the VAMC, on April 8, 2013 for medication review. (Tr. at 658-61). Claimant related a myriad of psychological symptoms, but advised Dr. Javed he currently was not taking any psychotropic medication, because medications had not helped him in the past. (Tr. at 658). On mental status examination, Claimant was alert and oriented, made good eye contact, and had no obvious psychomotor abnormality. (Tr. at 659). Dr. Javed diagnosed Claimant with Mood Disorder, NOS, with psychosis. (Tr. at 660). Dr. Javed decided that in view of Claimant's sensitivity to certain types of medications in the past, he would try a new medication, Abilify 2.5 mg, to treat Claimant's mood swings and depression.

Claimant presented to Dr. Callen on April 11, 2013 for skill building and treatment programs at the VAMC's Psychosocial Rehabilitation and Recovery Center ("PRRC"). (Tr. at 657-58). Claimant continued to complain of depression, persecutory delusions, tactile hallucinations, and avolition. He also reported diminished interest in activities, feelings of worthlessness, and problems with concentration. (Tr. at 658). Dr. Callen assessed Claimant with Major Depressive Disorder, Mild, and Delusional Disorder. Claimant appeared alert and oriented with clear speech and good eye contact. His mood was euthymic and his affect was mood congruent. He reported having auditory hallucinations and paranoid delusions, and Dr. Callen found evidence of both. (*Id.*).

That same day, Claimant met with Deborah Sull-Lewis, LICSW, to complete his initial application to the PRRC. (Tr. at 653-57). He complained of poor sleep, and denied daytime napping. He described obsessive-compulsive tendencies.  (Tr. at 654). He appeared alert and oriented with good eye contact and clear speech. His mood was euthymic with a mood-congruent affect. His insight and judgment were fair. (Tr. at 655). Claimant was assessed with Major Depressive Disorder, with psychotic features, and

Delusional Disorder. He received a GAF score of 48. (Tr. at 656). Claimant expressed a desire to develop better social skills and to find work. Ms. Sull-Lewis found that Claimant was eligible for PRRC and arranged for him to attend orientation. (Tr. at 657).

On April 15, 2013, Claimant attended the PRRC orientation group. (Tr. at 653). Charles M. Weinberg, LICSW, noted that Claimant actively participated in the session, asking several good questions and expressing an awareness of his need for support with social skills and his desire to go back to work. Mr. Weinberg assessed Claimant with depression and planned to help Claimant work on his social skills. (*Id.*).

## B. Evaluations and Opinions

### *Dr. Norman Berg*

On December 11, 2010, Claimant was referred by the Bureau of Disability Determination for a psychological evaluation performed by Norman L. Berg, Ph.D., of Xavier University in Cincinnati, Ohio. (Tr. at 281-87). Dr. Berg noted that Claimant drove himself to the evaluation, arriving approximately one hour early. (Tr. at 281). Claimant reported that he was not married, had never been married, and had no children. He was currently living with a couple of friends in a house in Peebles, Ohio. Claimant stated that he was applying for disability because he "can't be around people because I go ballistic and I don't drive at night or in the snow or ice." (Tr. at 281). Claimant reported that even driving to the appointment made him anxious. (Tr. at 283). He provided Dr. Berg with relevant history of his motor vehicle accidents and of the fatal accident involving his fiancé and their son. Claimant provided history of a normal childhood, indicating that he enlisted in the Army at age nineteen, remained in the service for six and a half years, and was honorably discharged. Physically, Claimant reported that he was in good health and had no problems using his hands, walking, standing, bending, sitting, stooping, or lifting.

(Tr. at 282). Claimant similarly indicated that his educational and work histories were average, and he worked up until he had the truck accident and was fired from his job.

Dr. Berg performed a mental status examination, documenting that Claimant had clear, coherent speech and goal-directed thought processes. Claimant complained of feeling depressed over "everything and life in general." Dr. Berg noted that Claimant appeared moderately depressed; however, there was no indication that he experienced major mood swings, had blunting of affect, or psychomotor retardation. (*Id.*). Claimant maintained moderate eye contact. He reported getting four hours of sleep each night, and his sleep was regularly interrupted by nightmares. ((Tr. at 283). In addition, Claimant complained of having anxiety for the past twenty years. Dr. Berg observed that while Claimant appeared mildly anxious, there were no motor indices of anxiety. (Tr. at 284). Claimant had adequate memory processes with no major impairments, and functioned at a moderate to moderately slow rate. He was able to concentrate. Claimant described his daily activities as attending to his personal hygiene needs, watching television, attending to the six cats that belonged to his housemates, doing laundry and household chores, and shopping when necessary. Claimant indicated that he had problems being around people, and spent time alone. (Tr. at 285). Dr. Berg diagnosed Claimant with Depressive Disorder, with anxiety, NOS, and PTSD, chronic. Claimant was given a GAF score of 56. (Tr. at 285).

Dr. Berg summarized his findings and conclusions, noting that Claimant had no apparent physical problems and was of average intelligence. Claimant's memory, speech, language, attention, and concentration were all intact. Claimant did appear moderately depressed and mildly anxious with features of PTSD. (Tr. at 286). There was no indication of psychotic processes. Claimant was given a symptom severity rating of 56 based on depression, anxiety, and features of PTSD related to his accident. He was also given a

functional severity rating of 56 based on his tendency to socially withdraw, as well as reduced tolerance to stress related to his emotional condition, with his overall GAF score being 56. (Tr. at 286). With respect to work-related mental abilities, Dr. Berg opined that Claimant was not impaired in his ability to understand, remember and follow instructions. He was mildly impaired in his ability to maintain attention, concentration, persistence, and pace to perform simple tasks and to perform multi-step tasks. (*Id.*). In addition, Claimant was moderately impaired in his ability to relate to others, and in his ability to withstand the stress and pressure associated with day-to-day work activity. (Tr. at 286-87).

### David Dietz, Ph.D.

On January 12, 2011, David Dietz, Ph.D., completed a Psychiatric Review Technique form at the request of the SSA. (Tr. at 71-72). Dr. Deitz found Claimant to have medically determinable impairments of Affective Disorder and Anxiety-Related Disorder, neither of which precisely satisfied the diagnostic criteria. (Tr. at 71). He felt Claimant had only mild limitations in activities of daily living, but had moderate limitations in his abilities to maintain social functioning, and to maintain concentration, persistence, or pace. Claimant had no episodes of decompensation. Dr. Dietz also found no evidence of paragraph "C" criteria. Dr. Deitz had reviewed the findings and conclusions of Dr. Berg and felt that they were consistent with the objective medical records. Dr. Dietz recommended that a mental residual functional assessment of Claimant be performed. He found Claimant only partially credible given the lack of objective evidence substantiating the severe symptoms described by Claimant. (Tr. at 72).

By report of same date, Dr. Deitz completed a Mental Residual Functional Capacity Assessment. (Tr. at 72-74). As to limitations in understanding and memory, Dr. Deitz

found Claimant had no limitations in the ability to remember locations or work-like procedures, or understand and remember very short and simple instructions; however, he had some limitation, but less than a significant limitation, in his ability to understand and remember detailed instructions. Overall, Dr. Dietz opined that Claimant might occasionally have memory problems due to flashbacks, but he was no more than mildly impaired. (Tr. at 73). Regarding sustained concentration and persistence, Dr. Dietz opined that Claimant had no limitations in carrying out short, simple instructions, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, sustaining an ordinary routine without special supervision and making simple work-related decisions. He had some mild limitations in his ability to carry out detailed instructions, and maintain attention and concentration for extended periods of time. (*Id.*). Dr. Dietz felt that Claimant was moderately limited in his ability to work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. Socially, Claimant was found to be moderately limited overall. (*Id.*). While he was not significantly limited in his ability to ask simple questions, request assistance or get along with co-workers or peers without distracting them or exhibiting behavioral extremes, Claimant was found to be moderately limited in his ability to interact appropriately with the general public, accept instructions, and respond appropriately to criticism from supervisors. However, Dr. Dietz found no evidence of limitations in Claimant's ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. at 74). Dr. Dietz assessed Claimant to be moderately limited in his ability to relate to others. Finally, as to adaption in the work place, Claimant

26

was not significantly limited in his ability to travel in unfamiliar places or use public transportation, and there was no evidence of any limitation in his ability to be aware of normal hazards and take appropriate precautions or set realistic goals or make plans independent of others. On the other hand, Claimant was found moderately limited in his ability to respond appropriately to changes in the work setting and in his ability to handle stress. (*Id.*). In his narrative RFC opinion, Dr. Dietz concluded that Claimant could do a wide range of tasks in a stable environment without any changes or strict production and/or time standards. He believed Claimant had the ability to deal with others on an occasional and superficial basis; however, Claimant should not work at a job that required more than occasional travel. (*Id.*).

### *Karla Voyten, Ph.D.*

On August 19, 2011, Karla Voyten, Ph.D., completed a Psychiatric Review Technique. (Tr. at 96-97). According to Dr. Voyten, Claimant's primary mental health impairments were Affective Disorder and Anxiety-Related Disorder, neither of which met specific diagnostic criteria. (Tr. at 96). Dr. Voyten found Claimant had mild restrictions in activities of daily living, moderate limitations in maintaining social functioning, concentration, persistence and pace; however, he had no history of episodes of decompensation. She did not find evidence to establish the presence of the paragraph "C" criteria. (Tr. at 96-7). By report of same date, Dr. Voyten reviewed Dr. Dietz's Mental Residual Functional Capacity Assessment. (Tr. at 100-102). Dr. Voyten noted that, after Dr. Dietz's assessment, Claimant alleged worsening symptoms of depression with increased nightmares and eating problems. However, Claimant's GAF score had not been decreased by his therapist, and there was no evidence of severe decompensation. (Tr. at 102). Accordingly, Dr. Voyten opined that Claimant's increased complaints still fell within

the limitations set forth by Dr. Dietz in his Mental Residual Functional Assessment. Consequently, she affirmed the initial assessment as written by Dr. Deitz. (*Id.*).

## VI.   <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.  **Discussion**

As previously stated, Claimant contends that the RFC finding was incomplete, because it lacked some of the function-by-function opinions expressed by Dr. Dietz and adopted by Dr. Voyten. As a result, when the vocational expert identified jobs that Claimant was capable of doing, her opinions were based upon an inadequate RFC finding. In support of this position, Claimant emphasizes that when his attorney asked hypothetical questions that fully accounted for Claimant's work-related limitations, the vocational expert opined that no jobs were available to Claimant. Specifically, Claimant compares the following hypothetical question posed by the ALJ with the questions posed by Claimant's counsel. The ALJ asked the vocational expert to assume:

> [A] person of the claimant's age, education and work experience and skill set who's able to do medium work. Stand for approximately six hours in an eight-hour day, sit approximately six hours in an eight-hour day. Can never climb ladders, ropes or scaffolds. Can frequently climb ramps or stairs and occasionally crawl. Must avoid all use of moving machinery and all exposure to unprotected heights. The work must be limited to simple, routine and repetitive tasks performed in a work environment free of fast paced production requirements, involving only simple work related decisions and with few, if any, work place changes. Could only occasionally interact with the public. Only occasionally interact with coworkers and with only occasional supervision.

(Tr. at 62). Using these assumptions, which perfectly mirrored the ALJ's RFC finding, the vocational expert found jobs that Claimant was capable of doing. (*Id*. at 62-63). However, when Claimant's attorney added the following limitations, the vocational expert opined that there would be no jobs that Claimant could perform:

> "[M]oderate limitations in work in coordination with or proximity to others, without being distracted by them, moderate limitations completing a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without unreasonable number and length of rest periods, interact appropriately with the general public, accept instruction and respond appropriately to criticism from supervisors, relate to others, respond appropriately to changes in the work

> setting, and deal with work stress. ... If we were to define moderate as up to one-third of the time, further assume occasional problems with his memory because of flashbacks, but only mild limitations, concentration mild limitations and assume that mild means less than ten percent of the time."

(Tr. at 64). The vocational expert's answer remained negative when Claimant's counsel added that the flashbacks and anxiety might preclude even simple tasks ten percent of the workday, and when counsel added the limitation that Claimant suffered from paranoid delusions "involving the belief that you're being conspired against, cheated, spied on, followed and this person is suffering from this on a routine, regular basis." (Tr. at 65). Claimant argues that this exchange proves the insufficiency of the RFC finding. Moreover, Claimant adds that if the ALJ decided not to adopt all of the function-by-function opinions, he should have explained his rationale for including some of the consultants' opinions, but not all of them.

In order for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into a RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted); *see also Russell v. Barnhart*, 58 F. App'x 25,

30

30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005).

Residual functional capacity is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. 1996). RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations and is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* Social Security Ruling 96-8p provides guidance on how an ALJ should determine a claimant's RFC. According to the Ruling, the ALJ's RFC analysis requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. A proper RFC assessment requires the ALJ to "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (e.g. 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the record." *Id.* Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7. The ALJ "must always consider and address medical source opinions" in assessing the Claimant's RFC, and "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

Having reviewed the record and the written decision, the undersigned **FINDS** that the ALJ's RFC assessment adequately addresses all of Claimant's work-related functional limitations. Therefore, the ALJ's hypothetical question to the vocational expert was complete. Accordingly, his decision that Claimant was not disabled, which was based upon the vocational expert's testimony, is supported by substantial evidence.

Claimant is correct that a proper RFC assessment would necessarily involve an analysis of Claimant's limitations and abilities on a function-by-function basis. *See Mascio v. Colvin,* 780 F.3d 632, 636 (4th Cir. 2014). "Only after that may [residual functional capacity] be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." *Id.* (citing SSR 96-8p). However, contrary to Claimant's contention, there is no requirement that the RFC *finding* contain an

exhaustive discussion of each individual function considered by the ALJ. Rather, at step 5 of the sequential process, the ALJ must express a claimant's RFC in terms of the maximum exertional level at which the claimant can perform sustained work-related activities in a work setting on a "regular and continuing basis," combined with any specific exertional or non-exertional limitations that might reduce the occupational base represented by the relevant exertional level. SSR 96-8p, 1996 WL 374184, at *3. The ALJ must explain how he reached his RFC finding through a narrative discussion, but that narrative need not include a comment on every piece of evidence, or on every nuance of an expert's opinion. *See Reid v. Comm'r of Soc. Sec.,* 769 F.3d 861, 865 (4th Cir.2014) (quoting *Dyer v. Barnhart,* 395 F.3d 1206, 1211 (11th Cir.2005) (holding that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision."); *and Jividen v. Coleman,* Civil Action No. 3:12–04698 2014 WL 1333196, at *6 (S.D.W.Va. Mar. 31, 2014). The ALJ is not expected to explain at length why he agreed or disagreed with each severity level assigned by a consulting expert to each work-related function reviewed. Rather, the ALJ is obligated to provide an explanation for the RFC finding that is sufficient to inform a reviewing court of the ALJ's thought process, that identifies the evidence most significant to his conclusion, and that resolves substantive conflicts in the evidence. If the ALJ's conclusion is explained in a clear narrative and is supported by substantial evidence in the record, then the ALJ has fulfilled his duty. *See e.g., Mellon v. Astrue,* C/A No. 4:08–2110–MBS 2009 WL 2777653, at *13 (D. S.C. Aug 31, 2009) (holding "that so long as the narrative opinion is sufficiently detailed and cogent on the ultimate issues for the reviewing court to follow the ALJ's logic and reasoning and supported by substantial evidence in the record, then the lack of specific findings on more subordinate issues (such as the domains of functioning in mental impairment claims)

33

does not require reversal.").

Here, the ALJ clearly conducted a function-by-function analysis when crafting limitations to include in the RFC finding. First, when assessing the severity of Claimant's mental impairments at step two of the sequential process, the ALJ discussed Dr. Dietz's findings as to specific work-related functions, as well as his opinions regarding the level of impairment experienced by Claimant in the four broad functional domains comprising the paragraph "B" criteria. (Tr. at 23-24). Then, at the fifth step of the process, the ALJ referred back to his earlier discussion of Dr. Dietz's reports, stating that he gave great weight to the opinions of Dr. Dietz and Dr. Voyten regarding the paragraph "B" criteria. The ALJ also discussed the opinions of Dr. Berg, again pointing out certain findings made by Dr. Berg on specific work-related functions; such as, Claimant's ability to maintain concentration, relate to others, and withstand the stress and pressure associated with day-to-day work life. (Tr. at 29). Furthermore, the ALJ provided a thorough review of the pertinent counseling notes, commenting on how he analyzed some of the data, including Claimant's GAF scores, his subjective reports, and the mental status evaluations of the therapists. (Tr. at 28-29). The ALJ demonstrated a good familiarity with the treatment records, reconciled disputes in the record (for example, choosing to disregard an opinion that Claimant was a malingerer), and provided a logical explanation for his ultimate findings.

Moreover, the ALJ's RFC finding was entirely consistent with the agency experts' opinions. Both Dr. Dietz and Dr. Voyten agreed that while Claimant had limitations in his ability to work with others and handle job-related stress, he was still fully capable of working in a stable environment, without constant interaction with others, without strict production standards, and without frequent changes. (Tr. at 74, 102). These are the very

34

limitations that the ALJ included in Claimant's RFC finding. Specifically, in his RFC narrative assessment, Dr. Dietz stated that Claimant "is able to do a wide range of tasks in a stable environment [without] many changes or strict production/time standards. [Claimant] could deal [with] others on an [occasional] and superficial basis. [Claimant] should not work at a job requiring more than occasional travel." (Tr. at 74, 102). This assessment was affirmed by Dr. Voyten and effectively adopted by the ALJ, when he found that Claimant "is limited to simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work-related decisions, and with few, if any, workplace changes. Finally, the claimant is limited to occasional supervision and interaction with the public and co-workers." (Tr. at 25).

On closer review of Claimant's memorandum, it is plain that Claimant's criticism of the ALJ is not that he failed to make an RFC finding that adequately addressed Claimant's impairments. Instead, his criticism is that the ALJ did not highlight certain findings made by the experts in their function-by-function analysis. However, as the Commissioner points out, the function-by-function worksheet completed by the experts is **not** intended to be the RFC assessment. (ECF No. 11 at 9, n. 8). Instead, the worksheet forces the experts to consider Claimant's ability to perform certain individual work-related functions. Nevertheless, the experts must still reconcile and synthesize the underlying findings to develop a narrative RFC assessment. The narrative, not the worksheet, is the experts RFC opinion. *Taylor v. Astrue,* No. 5:10-cv-263, 2011 WL 1599679, at *11-12 (E.D.N.C. Mar. 23, 2011) (explaining the various sections of the MRFC form and noting that the function-by-function section was a "worksheet to aid" in making an RFC assessment; therefore, the ALJ need not explicitly include the mental activities listed in that section as part of the RFC finding). Because the worksheet is simply an aid

35

to achieve an RFC conclusion, the ALJ "is under no obligation to accept the 'check-box conclusions' found in Section I of the Mental RFC form. Instead, as provided on the face of the form itself, the criteria found in Section I of the form should be used to provide a more detailed assessment of RFC in Section III of the form." *Pippen v. Astrue*, No. 1:09CV308, 2010 WL 3656002, at *6 (W.D.N.C. Aug. 24, 2010). As the *Pippen* court explained:

> The Social Security Administration's own *Policy Memorandums* (hereinafter "POMS") support a finding that an ALJ is not required to include each of the moderate limitations set forth in Section I of the Mental RFC assessment form in his hypothetical question:
>
> The purpose of section I ("Summary Conclusion") [of the MRFC form] is chiefly to have a worksheet to ensure that the psychiatrist or psychologist has considered each of these pertinent mental activities and the claimant's or beneficiary's degree of limitation for sustaining these activities over a normal workday and workweek on an ongoing, appropriate, and independent basis. **It is the narrative** written by the psychiatrist or psychologist **in section III** ("Functional Capacity Assessment") of [the MRFC form] **that adjudicators are to use as the assessment of RFC.** Adjudicators must take the RFC assessment **in section III** and decide what significance the elements discussed in this RFC assessment have in terms of the person's ability to meet the mental demands of past work or other work.[4]

*Id.* (citing POMS DI 25020.010.B.1 (emphasis in original)); *see, also, Bradley v. Colvin,* No. 3:14–000284–FDW, 2015 WL 93720, at *4-5 (W.D.N.C. Jan. 7, 2015); and *Lester v. Colvin,* No. 1:13CV759, 2015 WL 1458139, at *9 (M.D.N.C. Mar. 30, 2015.

---

[4] As the Commissioner indicates, the form used by Dr. Dietz and Dr. Voyten is a slightly different version than the form described in POMS. However, the section referred to by Claimant as containing RFC opinions is essentially the Section I worksheet described by the *Pippen* Court. Indeed, the form used by Dr. Dietz and Dr. Voyten explains the difference between the questions requiring review of Claimant's limitations on a function-by-function basis and the narrative sections, stating:

> The questions below help determine the individual's ability to perform sustained work activities. ***However, the actual mental residual functional capacity assessment is recorded in the narrative discussion(s) in the explanation text boxes.***

(Tr. at 72) (emphasis added).

Thus, Claimant's criticism regarding the ALJ's alleged lack of explanation for rejecting portions of the experts' opinions is without merit. The ALJ need not comment on each of the expert's function-by-function assessments as long as the ALJ's narrative explanation describes the weight he gives to expert opinions, the medical and other evidence of record that he relied upon, and the reasons for his findings. *Bennett v. Colvin,* No. 5:13–CV–871–D, 2015 WL 354170, at *8-9 (E.D.N.C. Jan. 29, 2015) (finding that the ALJ is not required to prepare a detailed function-by-function analysis; a narrative discussion will suffice). Here, the ALJ's RFC finding was complete, consistent with the experts' opinions and the evidence of record, was clearly explained, and was supported by substantial evidence. As such, it follows that the hypothetical question posed to the vocational expert, which mirrored the RFC finding, provided a sound basis for her opinions.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 10), **GRANT** Defendant's Motion for Judgment on the Pleadings, (ECF No. 11), and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with

the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  October 26, 2015

Cheryl A. Eifert
United States Magistrate Judge